# EXHIBIT "A"

2:44 

MO

Mario >

Thu, Feb 28, 2:50 PM

I was picking up a check for Cami. Know you are busy. Just wanted to ask you to serve that bizup subpoena. Thanks!! Danielle said it's ready.

Okay no worries

Thanks buddy

Jess is staying here?

Yea. Leaving tonight. Had get her a bed in mental health facility. She going to Lehigh valley late afternoon

Why here though?

It was only vacant over weekend she got released fri from other place. They charged her 249/night on weekend

  iMessage 

2:44



MO

Mario >

Thanks!! Danielle said it's ready.

Okay no worries

Thanks buddy

Jess is staying here?

Yea. Leaving tonight. Had get her a bed in mental health facility. She going to Lehigh valley late afternoon

Why here though?

It was only vacant over weekend she got released fri from other place. They charged her 249/night on weekend

I won't allow her around cami till she deals with bipolar. U have no idea stress I'm under.

Delivered

  iMessage 

      

2:42 

 

2 People >

iMessage
**Thu, Feb 28,** 5:39 PM

(570) 242-6741

Check your personal or county email for an employment status notice.



**Fri, Mar 1,** 11:39 AM

(570) 242-6741

Michael- your employment with the County is terminated. You have until 3:00 pm to return county property. You can return the property by coming to the detective center side door and someone will come out to retrieve it. If you fail to comply by 3:00pm today you may be subject to civil and or criminal liability.



There is an arrest and detain warrant for Jessica Butts. You are to bring her immediately to the detective center.





iMessage

      

2:42 ✈



2 People ›

return county property. You can return the property by coming to the detective center side door and someone will come out to retrieve it. If you fail to comply by 3:00pm today you may be subject to civil and or criminal liability.



There is an arrest and detain warrant for Jessica Butts. You are to bring her immediately to the detective center.



I am not in town.   I do not know where she is. She was supposed to go to Lehigh valley hospital for mental evaluation.

I am in Philadelphia

Fri, Mar 1, 2:35 PM

+1 (570) 242-6741


FaceTime
Call Ended



  iMessage

   Pay    

2:45

BW

Brian >

Ok. That's odd

I sent it.

Thanks

Do you want to find out how they want me to return equipment? I'm not walking into office carrying a rifle.

I shut off their phone as instructed so can you work as intermediary. Their stuff will not appear on personal devices.

Sure. I'll track down Eric and see what he says.

Give me a sec.

Thanks appreciate it.

Eric and Michael have said to contact Eric to make arrangements.

Text Message



2:40





2 People ›

iMessage
Fri, Mar 1, 2:48 PM

+1 (570) 977-2872



Mike please contact Eric or me on my cell - it's very important this is resolved now.

Not sure who this is my contacts all gone but I advised Eric I am in Philadelphia so someone can come to my house sat 7 am or mon 7 am to obtain equipment

+1 (570) 977-2872

That's not acceptable Mike we need the equipment the federal authorities advise that your continued possession of the M4 is a federal offense which they may proceed with forthwith - so no delays - where is the gun and other equipment. MMancuso





iMessage

2:40



2 People >

Ok when I get home this evening you can send some to retrieve

Your car is on parking deck. Other stuff is in state car. They are retrieving car on Monday

I can let you know when I am back in town. I obviously needed to meet with counsel. You could have set up meeting obtained equipment then terminated. I did not create this situation and have no intent to withhold any equipment

+1 (570) 977-2872



As per attorney McComb you are to contact Eric to make the arrangements for giving the property to him.

I spoke to my attorney I advised when I get home I will



iMessage

2:41



2 People

> I spoke to my attorney I advised when I get home I will call and someone can come and retrieve.

+1 (570) 977-2872

Ok what is your ETA? Have everything packed and ready so Eric can easily transport- also send me a list of the items ahead of time

> Absolutely I'll have ready. I'll meet at bottom of my driveway. I don't want any slips & falls on my property. It will be on video as my house is fully covered by an atd system

> Will I get receipts??

+1 (570) 977-2872

Yes what time?

> Sorry I'm guessing 8. But I'll notify as soon as I get back

iMessage

      

2:41



2 People >

> Sorry I'm guessing 8. But I'll notify as soon as I get back and get stuff around. I would assume a similar urgency in return of my personal property

+1 (570) 977-2872

 Ok text when your in

Ok

**Fri, Mar 1,** 8:06 PM

+1 (570) 977-2872

 Mike will you be ready soon?

Almost

+1 (570) 977-2872

Ok

 I'll tell Eric head out

My truck is end of driveway. When he arrives will unlock tailgate. I'd & phone with surface bag. Gun bag is open

  iMessage 

2:41 ⏀



2 People ›

+1 (570) 977-2872

Mike will you be ready soon?

Almost

+1 (570) 977-2872

Ok

I'll tell Eric head out

My truck is end of driveway. When he arrives will unlock tailgate. I'd & phone with surface bag. Gun bag is open with both guns breach open so be careful not to drop.

I am again requesting stay off of property and receipt placed in back. This is my private cell Eric not to use it.

My personal property are monitors keyboard charging devices everything on top of desk organizer sissies stapler. Books training certificates etc. in car body armor

iMessage

2:41 





2 People >

My truck is end of driveway.
When he arrives will unlock
tailgate. I'd & phone with
surface bag. Gun bag is open
with both guns breach open
so be careful not to drop.

I am again requesting stay off
of property and receipt
placed in back. This is my
private cell Eric not to use it.

My personal property are
monitors keyboard charging
devices everything on top of
desk organizer sissies stapler.
Books training certificates
etc. in car body armor.
Portable radio charger and
AirPods in glass holder.
Please return my property
ASAP and contact attorney to
arrange delivery and any
other issues.

+1 (570) 977-2872

   iMessage  

      

2:41 ⏍



2 People ›

+1 (570) 977-2872

 Ok I copied your text to Eric

Thank you

+1 (570) 977-2872

 No problem

Is what it is Mike.  There is a time and place to handle this as you know I've hired a very good attorney we'll handle in court.

I'm going to bed soon

Someone is knocking on my door. I do not want anyone on my property my goddaughter is crying.

+1 (570) 977-2872

 Your credentials need to be given

 Also keys to county car

iMessage

2:41 ⚐



2 People ›

They are in surface bag

+1 (570) 977-2872

 Badge also?

Keys I forgot.

Yes. I advised that in text you forwarded to Eric

Not even sure where keys are off hand I apologize I will locate and get them to you

+1 (570) 977-2872

Still need badge

Also are you getting the keys tonight?



It's in surface front pouch

I'm in my underwear in bed.

+1 (570) 977-2872

 What about second badge?

I do not have a second badge.

  iMessage 

      

2:42

2 People >

> I do not have a second badge. It's only badge that was given to me

> I even complained when I got an old badge and Tom got a new one.

+1 (570) 977-2872

Ok but still need keys because they are good for all the vehicles in fleet

> Yes I will get them to you.

+1 (570) 977-2872

They need them now Mike

> I'm in bed. I do not know where they are at moment.

+1 (570) 977-2872

Well I appreciate that but this is a security issue and needs to be taken care of now

> Ok. My god daughter is in my

iMessage

2:42 ⏎ 

 

2 People >

> Ok. My god daughter is in my arms crying from whomever shining their flashlights in my windows and activating red & blue lights. On video from house, I am getting out of bed and looking for them.

+1 (570) 977-2872

 Ok first thing Monday then

> I have them. Where do you want them. Mike I asked no one use my personal number and no one come on my property

Sat, Mar 2, 9:39 AM

+1 (570) 977-2872

 We need the password for the phone.

Sat, Mar 2, 12:02 PM

+1 (570) 977-2872

 That would be helpful

Sat, Mar 2, 4:52 PM

  iMessage 

      

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL KREISCHER                  :
                                   :   CIVIL ACTION NO. 21-cv-00221
              Plaintiff,           :
                                   :
      v.                           :
                                   :
E. DAVID CHRISTINE, JR.,           :
MICHAEL MANCUSO,                   :
WENDY B. SERFASS,                  :
MARIO ORLANDO and                  :
ERIC KERCHNER,                     :
                                   :
              Defendants.          :

## **ORDER**

AND NOW, this            day of                  , upon consideration of

Plaintiff's Motion to Compel Discovery and any response thereto, it is hereby

ORDERED that:

(1) the motion is GRANTED and defendants shall serve a written response

to plaintiff's Request for Production of Documents and all responsive documents

within 10 days of this order; and

(2) pursuant to Fed. R. Civ. P. 37 (a)(5), defendants shall pay plaintiff the

reasonable amount of attorney's fees incurred in making this motion.

BY THE COURT:

_____
                    U. S. M. J.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL KREISCHER                          :
                                           :   CIVIL ACTION NO. 21-cv-00221
             Plaintiff,                    :
                                           :
     v.                                    :
                                           :
E. DAVID CHRISTINE, JR.,                    :
MICHAEL MANCUSO,                           :
WENDY B. SERFASS,                          :
MARIO ORLANDO and                          :
ERIC KERCHNER,                             :
                                           :
             Defendants.                   :

## PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff, Michael Kreischer, moves the Court pursuant to Rule 37(a) of the

Federal Rules of Civil Procedure and Local Rule LR 26.3 for an order compelling

defendants to produce requested discovery.

In support of his motion, plaintiff states the following:

1.     This is an action brought by Michael Kreischer ("Kreischer'), a

former Monroe County detective, under 42 U.S.C. §1983 and state law, relating to

his termination and subsequent defamation by defendants. Kreischer alleged in his

complaint that he was fired, without notice, after complaining about wrongdoing

within the County Detectives Office and, after his termination, defendants defamed

1

him by falsely claiming that he was terminated for helping a fugitive evade arrest and for other wrongful and illegal conduct.

2.      To obtain discovery necessary for his claims, Kreischer served a document request on June 24, 2021, requesting, among other things, the defendants' personnel files, emails relating to Kreischer's termination and the dissemination of false and misleading information about him both internally and to third parties. A copy of the document request is attached as Exhibit "A."

3.      Defendants have not served a response to the document request.

4.      Rather, defendants produced a few documents from Kreischer's personnel file and a handful of other documents.

5.      Defense counsel stated that he did not believe that defendants had possession of the emails that were requested.

6.      Plaintiff has requested, repeatedly,. that defendants serve a response to Kreischer's document request, but it has not been forthcoming.

7.      On October 13, 2021, the parties had a "meet and confer" to discuss defendants' delinquent production and defense counsel stated that a response would be served, and counsel would check to see what other documents could be produced.

8.      That did not occur.

2

9.     The failure of defendants to serve a response or responsive documents obviously hampers plaintiff's ability to prepare his case for trial, and impedes further discovery in the matter, including the taking of depositions.

10.     Plaintiff's counsel hereby certifies, pursuant to M.D. Pa. Local Rule 26.3, that he has made several good faith efforts to obtain the requested discovery but has been unsuccessful and requires the Court's assistance in the form of an order compelling discovery.

11.     Fed. R. Civ. P. 37(a)(3)(B)(iv) specifically authorizes the Court to compel discovery, where, as here, a party has failed to produce discovery or a response. In addition, Rule 37(a)(5) states that "the court must, after giving an opportunity to be heard require the party or deponent who conduct necessitated the motion ...to pay the movant's reasonable expenses...and attorney's fees."

12.     For all of these reasons, Plaintiff submits that entry of an order compelling discovery and the award of attorney's fees are necessary.

3

WHEREFORE, plaintiff requests that his motion be granted.

Respectfully submitted,

ZARWIN, BAUM, DeVITO,
KAPLAN, SCHAER & TODDY,
P.C.

*/s/ David F. McComb*
David F. Mccomb
dfmccomb@zarwin.com
Zachary A. Silverstein
zsilverstein@zarwin.com
One Commerce Square
2000 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 569-2800
Attorneys for Plaintiff

DATED: November 2, 2021

<u>CERTIFICATE OF SERVICE</u>

I, David F. McComb, hereby certify that I served a copy of the foregoing

Motion by making it available to all registered users of the Court's ECF system,

including the following:

> Gerard J. Geiger, Esq.
> 712 Monroe Street
> Stroudsburg, PA 18360-0511


> <u>/s/ David F. McComb</u>
> DAVID F. McCOMB


DATED:  November 2, 2021

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL KREISCHER          :
         :
         :   CIVIL ACTION NO. 21-cv-00221
     Plaintiff,       :
         :
    v.           :
         :
E. DAVID CHRISTINE, JR.,    :
MICHAEL MANCUSO,       :
WENDY B. SERFASS,       :
MARIO ORLANDO and      :
ERIC KERCHNER,         :
         :
     Defendants.      :

**PLAINTIFF'S FIRST REQUEST
FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff hereby requests that

Defendants respond under oath to the following Requests for Production of Documents within

thirty (30) days of service hereof and make such documents available for inspection and copying

at the offices of Plaintiff's counsel, at 2005 Market Street, 16th Floor, Philadelphia, Pa 19103.

**INSTRUCTIONS**

1.  Please bates-stamp all documents produced, and utilize a method to properly and

efficiently relate responsive documents to specific requests herein.

2.  If any document is withheld under a claim of privilege or other protection, please produce

a privilege log and provide all the following information with respect to any such document(s),

so as to aid the Court and the Parties hereto in determining the validity of the claim of privilege

or other protection:

     a.  The identity of the person(s) who prepared the document and who signed the

        document, and over whose name it was sent or issued;

1

b.  The identity of the person(s) to whom the document was directed;

c.  The nature and substance of the document, with sufficient particularity to enable the Court and the parties thereto to identify the document;

d.  The date of the document;

e.  The identity of the person(s) who has (have) custody of, or control over, the document and each copy thereof;

f.  The identity of each person to whom a copy of the document was furnished

g.  The number of pages of the document;

h.  The basis on which any privilege or other protection is claimed; and

i.  Whether any non-privileged or non-protected matter is included in the document.

3.  In the event any additional discoverable documents or other relevant materials come to Defendants' attention after the date on which it answers the instant request, Defendants are reminded of their duty to supplement their response to this request if they learn that in some material respect their response or the information disclosed therein is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to Plaintiff during the discovery process or in writing.

**<u>DEFINITIONS</u>**

The following definitions and instructions are incorporated by reference whenever applicable in this document.

1.  The terms "you," "your," or "Defendants," as used herein, shall mean the Defendants named in the caption of this action, their servants, agents, employees, representatives, divisions, managers, accountants, and attorneys, and anyone else acting on their behalf.

2.  The term "person," or "persons," as used herein, shall include any natural person,

2

partnership, firm, corporation, trust, association, joint venture, public entity, business organization, or other legal entity.

3.  The term "Plaintiff" as used herein, shall mean the Plaintiff listed in the caption of the instant action.

4.  The term "document," or "documents," as used herein, shall mean the original, or a copy of any kind, of any written, typewritten, printed, electronic or recorded material whatsoever, whether maintained on paper hard copies or on an electronic or other storage medium. The term includes, but is not limited to, files, records, reports, logs, notes, journals, memoranda, letters, facsimiles (including cover sheets and transmission confirmation sheets therefore), diaries, calendars, articles, telegrams or other correspondence, voice mail (whether transcribed or not), electronic mail (whether printed out or not, and including electronic mail stored or maintained off Defendants' premises, such as with an internet service or e-mail provider), worksheets, recordings, studies, analyses, opinions, books, reports, transcriptions of recordings, lists, information retrievable from computers or media designed for use thereon, pictures, drawings, diagrams, schematics, maps, photographs (whether stored digitally or on hard copies) or other graphic representations, and any other physical means of communication, including audio or video tape recordings, Digital Audio Tape recordings, digital recordings, recordings preserved on recordable compact disc and magnetic tape, computer discs, or computer tape. The term specifically includes any drafts, whether or not used, of the foregoing, and any altered or annotated copies of the foregoing. It also includes any copies of originals, or duplicate documents, with notes, markings, or interlineations varying to any degree whatsoever from other existing copies. Such documents are deemed to be separate documents and are to be produced along with non-interlineated copies. In the case of all recordings or information not stored in

3

hard copy form, the originals shall be maintained for review in all cases.

5. The term "Complaint," as used herein, shall mean the Complaint on file in this action or any Amended Complaint.

6. The term "personnel file," as used herein, shall include any and all records maintained either in the normal course of business or for any special purpose with respect to the application, course of employment, and termination of any employee of any named Defendants, and specifically includes applications, disciplinary notices, performance evaluations, employment histories or summaries, records of residential addresses and telephone numbers, termination notices, job assignment or classification records, compensation and other similar records. For purposes of this request, the term "personnel record" need not include records of medical benefits, condition, or claims; designations of, or changes in, beneficiary; garnishments; income tax records; or insurance benefits, except as pertaining to the records of the Plaintiff (in which case such records are to be included).

Please produce the following:

## REQUEST FOR PRODUCTION OF DOCUMENTS

## DOCUMENT REQUEST NO. 1:

Produce any and all documents which support, evidence, relate, or otherwise pertain to any and all personnel policies or procedures of Defendants in effect in the last five (5) years, including but not limited to

a) Internal complaint or grievance procedures, including complaints of wrongdoing by other employees;

b) Any employee handbook or policy guides in place during Plaintiff's employment;

c) Any and all policies that in way bear on or illustrate defendants' expectations as to employee performance; and

d) Any and all policies regarding the duties and the appointment of County detectives.

4

**DOCUMENT REQUEST NO. 2**:

Produce all communications between or among the following, including text messages and email messages, that refer to Plaintiff in the "Re:" line or text:

   a.  E. David Christine, Jr.,

   b.  Michael Mancuso,

   c.  Wendy B. Serfass,

   d.  Mario Orlando,

   e.  Eric Kerchner,

   f.  Brian Webbe, and

   g.  Kim Lippincott.

**DOCUMENT REQUEST NO. 3**:

Produce documents relating or referring to any evaluation or review of Plaintiff's job performance, including any warnings, write-ups, disciplinary action and awards and commendations.

**DOCUMENT REQUEST NO. 4**:

Produce documents relating or referring to the allegations that Plaintiff: (1) had sexual or other improper relations with an informant; (2) helped a witness/informant evade arrest; and (3) attempted to defraud anyone.

**DOCUMENT REQUEST NO. 5**:

Produce documents relating or referring to any disclosure internally or externally of the three items set out in Request No. 4 and identify each and every individual to whom such disclosure was made and/or participated or was consulted in the decision to terminate Plaintiff's employment.

**DOCUMENT REQUEST NO. 6**:

Produce the personnel files for Plaintiff and the named Defendants.

**DOCUMENT REQUEST NO. 7:**

Produce documents referring or relating to the decision to terminate Plaintiff's employment and identify each and every individual advised of such decision in advance of the termination.

**DOCUMENT REQUEST NO. 8:**

Produce all documents that defendants relied upon, in whole or in part, to terminate plaintiff's employment.

**DOCUMENT REQUEST NO. 9:**

Produce any and all documents relating or referring to any review or investigation of allegations of plaintiff's alleged misconduct including, but not limited to:

a)   Written statements, memorializations, certifications or affidavits of witnesses, third parties, employees or former employees;

b)   Notes of interviews with witnesses, employees, former employees or third parties by any County employee, supervisor or agent of defendants;

c)   Audio recordings of any investigative hearing, witnesses, employees, former employees or third parties by any HR employee, supervisor or agent of defendants;

d)   Transcriptions of any investigative hearing or audio recordings of any and all oral statements and/or interviews of witnesses, employees, former employees or third parties by any HR employee, supervisor or agency of defendants;

e)   Reports regarding the results of any and all review(s) or investigation(s) of plaintiff by anyone; and

f)   Correspondence via e-mail, mail, or otherwise within defendants or between defendants and a third party or former employee about or concerning Plaintiff.

**DOCUMENT REQUEST NO. 10:**

Produce any and all documents relating or referring to Plaintiff's efforts to obtain employment after his termination, including but not limited to any communications among defendants or their staff regarding inquiries about Plaintiff from law enforcement agencies and any responses provided by defendants and their staff to law enforcement agencies about Plaintiff.

**DOCUMENT REQUEST NO. 11**

      Provide any and all documents relating or referring to any investigation into Plaintiff's complaints about disappearance of cigarettes from the Evidence Room and alleged irregularities about handling of gang-related information.

**DOCUMENT REQUEST NO. 12:**

      Produce every note, e-mail, memo or other document that refers or relates, references, illustrates or evidences any concern or complaint ever expressed verbally or in writing by Plaintiff to any employee or former employee of defendants.

**DOCUMENT REQUEST NO. 12:**

      Produce all documents relating to Plaintiff's eligibility for and participation in his LOFT ("Local Officer Full Time, Attorney General Office") assignment with the County.

**DOCUMENT REQUEST NO. 13**

      Produce all documents submitted by Defendants and/or Monroe County to the Pennsylvania Department of Labor regarding Plaintiff's unemployment compensation filing.

**DOCUMENT REQUEST NO. 14**

      Produce all documents reflecting all communications between Defendants and PNC Bank regarding Plaintiff.

**DOCUMENT REQUEST NO. 15**

      Produce all documents reflecting all communications between Defendants and Jessica Butts.

**DOCUMENT REQUEST NO. 16**

      Produce documents showing the policy for handling of confidential informants and confidential sources.

## DOCUMENT REQUEST NO. 17

Produce the order appointing Kimberly Lippincott as the confidential informant records custodian.

ZARWIN, BAUM, DeVITO,
KAPLAN SCHAER & TODDY, P.C.

By: /s/ David F. McComb

DAVID F. McCOMB
ZACHARY A. SILVERSTEIN
Attorneys for Plaintiff

DATED:  June 24, 2021

8

## CERTIFICATE OF SERVICE

I, David F. McComb, hereby certify that I today served a copy of the foregoing discovery requests upon counsel for defendants by email addressed to the following:

Gerard J. Geiger, Esq.
ggeiger@newmanwilliams.com
NEWMAN | WILLIAMS
712 Monroe Street
Stroudsburg, PA 18360-0511

Attorney for Defendants


_____/s/_____
David F. McComb


DATED:  June 24, 2021

9

# EXHIBIT "C"

NEWMAN WILLIAMS, P.C.
A PROFESSIONAL CORPORATION

ATTORNEYS FOR: Defendants

BY: GERARD J. GEIGER, ESQUIRE
IDENTIFICATION NO.: 44099
LAW OFFICES
712 MONROE STREET
P.O. BOX 511
STROUDSBURG, PA 18360-0511
(570) 421-9090 (voice)
(570) 424-9739 (fax)
ggeiger@newmanwilliams.com (email)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL KREISCHER, | : | CIVIL ACTION NO. 21-CV-00221 |
| Plaintiff, | : | |
| v. | : | |
| E. DAVID CHRISTINE, JR., MICHAEL MANCUSO, WENDY B. SERFASS, MARIO ORLANDO, and ERIC KERCHNER, | : | |
| Defendants. | : | |

### DEFENDANTS, E. DAVID CHRISTINE, JR., MICHAEL MANCUSO, WENDY B. SERFASS, MARIO ORLANDO, AND ERIC KERCHNER'S ANSWER TO PLAINTIFF, MICHAEL KREISCHER'S INTERROGATORIES

INTERROGATORY NO. 1:
As to any individuals who may have information about the Plaintiff's claims as alleged in his Complaint or Defendants' defenses as asserted in their Answer:

A.  Identify by name, along with the most current and last known address and telephone number, all persons who may have knowledge of the facts which tend to support or refute any claim or defense asserted in this case (regardless of whether the individual is currently employed), and describe the facts or knowledge of any person referenced in this interrogatory with particularity; and

B. State whether Defendants contend that any specified individual in response to subpart A herein is represented by Defendants' counsel.

**RESPONSE: Detectives Brian Webbe and Kim Lippincott of the Monroe County District Attorney Office may have knowledge of the requested information. Defendants are unable to speculate on what specific knowledge they may have. Detectives Brian Webbe and Kim Lippincott are not presently represented by Defendants' counsel in this case. Discovery is ongoing, additional information will be provided when/if it becomes available.**

INTERROGATORY NO. 2:

State why defendants or anyone acting on their behalf contacted law enforcement agencies immediately after Plaintiff's termination to advise them of his termination, and further identify:

A. The person or persons who made those communications;

B. What precisely was communicated; and

C. The person(s) who suggested or directed that such communications take place.

**RESPONSE: It is standard practice for the office to contact the Chiefs or Station Commanders for all local jurisdictions/barracks when a detective is suspended and/or terminated. Monroe County Control Center, Correctional Facility and the President Judge are also notified. No details are provided other than they are no longer associated with the office. The Sheriff's Office is specifically requested to remove the persons access to the Court's facilities by prox card. The County IT would be notified (although not necessarily immediately) so they can remove remote access if appropriate. This responsibility has fallen to Defendant, Wendy B. Serfass several times over the years and she has handled the notifications by telephone each time and in the same way in that she does not provide any unnecessary details. No reason is given, and it is not disclosed as to it being voluntary or otherwise. Discovery is ongoing, additional information will be provided when/if it becomes available.**

INTERROGATORY NO. 3:

State why defendants or anyone acting on their behalf contacted PNC Bank to discuss Plaintiff and his relationship with Jessica Stubbs, and further identify:

A. The person or persons who made those communications to PNC Bank and the bank official to whom the communications were made;

B. What precisely was communicated; and

C. The person(s) who suggested or directed that such communications take place.

**RESPONSE: It is Defendants' understanding from reading the Pennsylvania State Police report that members of the Pennsylvania State Police contacted PNC staff regarding the subsequent investigation into Kreischer's relationship with Jessica Butts. Discovery is ongoing, additional information will be provided when/if it becomes available.**

INTERROGATORY NO. 4:

State whether defendants or anyone acting on their behalf told or discussed with PNC Bank that Plaintiff had improperly obtained access to the account of Jessica Stubbs or was blackmailing/extorting her, and further identify:

A. The person or persons who made those communications;

B. What precisely was communicated; and

C. The person(s) who suggested or directed that such communications take place.

**RESPONSE: Defendants' do not recall contact with any persons from PNC Bank regarding Michael Kreischer. Discovery is ongoing, additional information will be provided when/if it becomes available.**

INTERROGATORY NO. 5:

State whether defendants or anyone acting on their behalf ever obtained cell phone records for Plaintiff or Jessica Stubbs, and further identify:

A. The person or persons who obtained those records;

B. What actions were employed to obtain those records;

C. What affidavits or other materials were submitted to a court or other judicial official to obtain those records and the affiant and any other person who submitted that material'

D. The name of the judicial officer to whom those materials were submitted;

E. The Court docket number; and

F. The reason (s) that defendants and Monroe County currently have no such records of those occurrences.

**RESPONSE: Detective Wendy B. Serfass did obtain cell phone records for Jessica Butts. Those records were obtained in an effort to locate her and create a timeline of her contact with Michael Kreischer during the time span she was staying at the Best Western, out of communication with her parole agent and to verify that Michael Kreischer had been truthful with Chief Kerchner and**

ADA Michael Mancuso about his contacts with her (for purposes of the
suspension of his employment). Discovery is ongoing, additional information
will be provided when/if it becomes available.

INTERROGATORY NO. 6:
State whether defendants or anyone acting on their behalf ever did surveillance on Plaintiff , and
further identify:

A. The person or persons who performed the surveillance and the person or persons who
   suggested, authorized or directed that the surveillance take place;

B. The time frame during which the surveillance was conducted;

C. Any records, notes or investigative reports that describe what information was obtained
   during the surveillance;

D. The person(s) who had access or reviewed those records, notes or investigative reports;
   and

E. The reason (s) that defendants and Monroe County currently have no such records of
   those occurrences.

**RESPONSE: Defendants' did not engage in any surveillance of Michael Kreischer.
Discovery is ongoing, additional information will be provided when/if it
becomes available.**

INTERROGATORY NO. 7:
State whether defendants or anyone acting on their behalf ever interviewed Jessica Stubbs while
she was in custody, and further identify:

A. The person or persons who interviewed Ms. Stubbs;

B. The date(s) during which the interview was conducted;

C. Any records, notes or investigative reports that describe what information was obtained
   during the interview;

D. The person(s) who had access or reviewed those records, notes or investigative reports;
   and

E. The reason (s) that defendants and Monroe County currently have no such records of
   those occurrences.

**RESPONSE: Detective Mario Orlando did have limited contact with Jessica Butts at the
Best Western, in the form of an attempt at a welfare check. His report has**

been previously provided. Discovery is ongoing, additional information will
be provided when/if it becomes available.

INTERROGATORY NO. 8:
State whether defendants or anyone acting on their behalf ever conducted an investigation of
whether cigarettes from the Evidence Room were consumed or gang records were improperly
maintained, both of which were reported by Plaintiff. If so, further identify:

A. The person or persons who the investigation(s);

B. The date(s) during which the investigation(s) were conducted;

C. Any records, notes or investigative reports that describe what information was obtained
during the investigation(s);

D. The person(s) who had access or reviewed those records, notes or investigative reports;
and

E. The reason (s) that defendants and Monroe County currently have no such records of
such investigation(s).

**RESPONSE:  Defendants' do not recall any investigation. Discovery is ongoing, additional
information will be provided when/if it becomes available.**

INTERROGATORY NO. 9:
State whether defendants or anyone acting on their behalf have retained any expert witness in
this matter and, if so, the person's name, address, telephone number and subjects in which he is
expected to provide expert testimony.

**RESPONSE:  Experts, if any, have not yet been determined. Discovery is ongoing,
additional information will be provided when/if it becomes available.**

INTERROGATORY NO. 10:
State whether defendants or anyone acting on their behalf have received any inquiries from
prospective employers of Plaintiff after his termination. If so,
further identify:

A. The person or person who responded to the inquiry(s);

B. The date(s) during which the inquiries were made;

C. Any records, notes or investigative reports that describe what information was disclosed
during the inquiries;

D.  The person(s) who had access or reviewed those records, notes or investigative reports; and

E.  The reason (s) that defendants and Monroe County currently have no such records of such investigation(s).

**RESPONSE: No.**

INTERROGATORY NO. 11:

State whether defendants or anyone acting on their behalf have received any inquiries from the Pennsylvania State Police about Plaintiff after his termination. If so, further identify:

A.  The person or persons who responded to the inquiry(s);

B.  The date(s) during which the inquiries were made;

C.  Any records, notes or investigative reports that describe what information was disclosed during the inquiries;

D.  The person(s) who had access or reviewed those records, notes or investigative reports; and

E.  The reason (s) that defendants and Monroe County currently have no such records of such investigation(s).

**RESPONSE:  At the conclusion of Detective Wendy B. Serfass' investigation (which ended when Michael Kreischer was terminated) she made a referral for investigation to the Pennsylvania State Police and provided them the information, records that she had obtained. She would have answered any questions regarding Michael Kreischer that were directed to her by PSP, but she has no specific recollection of any notable interactions past the referral. Discovery is ongoing, additional information will be provided when/if it becomes available.**

NEWMAN WILLIAMS, P.C.

By: _____

Gerard J. Geiger, Esquire
Attorney ID #44099
Attorney for Defendants

Dated: 7/12/2022

# EXHIBIT "D"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL KREISCHER,                    :
                                      :   No. 21-CV-00221
              Plaintiff               :
                                      :
       vs                             :
                                      :
E. DAVID CHRISTINE, JR.,              :
MICHAEL MANCUSO,                      :
WENDY B. SERFASS                      :
MARIO ORLANDO and ERIC KERCHNER,:
                                      :
              Defendants              :

DEPOSITION OF E. DAVID CHRISTINE, JR., ESQ.
      Taken in the law offices of Newman Williams,
712 Monroe Street, Stroudsburg, Pennsylvania, on Friday,
March 17th, 2023, commencing at 8:55 a.m., before
Jessica Mondello, Professional Court Reporter, Notary
Public.

APPEARANCES:

              ZARWIN, BAUM, DEVITO, KAPLAN, SCHAER &
              TODDY
              By:  DAVID F. MCCOMB, ESQ.
              2005 Market Street
              16th Floor
              Philadelphia, PA 19103
              Dfmccomb@zarwin.com
              (267) 765-9628
               --Representing the Plaintiff


                    *  *  *
              MAGNA LEGAL SERVICES
                866-624-6221
                www.MagnaLS.com



Page 22

```
 1    work so he could then move over to his new job.
 2                    Again, I don't know the timing
 3    of that or how many times I was told that, but
 4    that would have come to me, not from Detective
 5    Kerchner.  I recall that coming from Mr.
 6    Mancuso.
 7    Q.              Was it ever brought to your
 8    attention that Mr. Kreischer made complaints
 9    about the handling of evidence, cigarettes,
10    specifically, in the evidence room?
11    A.              No.
12    Q.              Never came to your attention?
13    A.              It did, I believe, in the
14    context of the complaint you filed.  It was the
15    first time I knew about this cigarette issue.
16    Q.              Did you ever hear any complaints
17    from any source that Mr. Kreischer may have had
18    about improper conduct with respect to
19    vehicles, usage of vehicles and funding of
20    vehicles?
21    A.              No.
22    Q.              Who participated in the decision
23    to terminate Mr. Kreischer's employment?
24    A.              Me.
25    Q.              And what were the --
```



Page 23

```
 1    specifically as you can recall, sir, what were
 2    the facts you relied upon in making the
 3    decision to terminate his employment?
 4    A.              Well, all the particulars elude
 5    me because of the passage of time and the
 6    imperfections of human recollection, including
 7    my own, but I do remember that I instantly
 8    decided that I wanted him fired, and expressed
 9    that, once I had learned that when he was
10    supposed to be, I believe, in Philadelphia with
11    either a medical or veterinary emergency,
12    having not kept in communication, according to
13    Mr. Kerchner, with him to -- he was summoned to
14    come to the office, having had difficulty on
15    Mr. Kerchner's part to -- for him to
16    communicate back to him that instead of being
17    in Philadelphia, he apparently was in a motel
18    known for drug distribution and drug use when
19    an operation was being done there by the Monroe
20    County Drug Task Force, and he was seen there.
21    And when I was informed of that, I said, he is
22    to be fired immediately.
23                    My original intention was to
24    suspend him to get him under control, but when
25    I heard that, I made the decision, and
```



Page 24

1    expressed it, that he is to be fired

2    immediately.

3    Q.            What specifically about his

4    presence at the motel concerned you?

5    A.            At that point, only that he

6    wasn't where he was supposed to be.

7                  And the background is, at some

8    point, he was terminated from -- we withdrew

9    from the LOFT -- whatever that agreement was

10   within the Attorney General's Office, we

11   withdrew from that because we wanted him to

12   come back to the office.  He was -- there

13   was -- a timeline eludes me, but he wasn't

14   communicating with Mr. Kerchner.  He wasn't

15   responding back to him.

16                 And so our intention was to

17   suspend him to try and get him under control

18   and find out what's going on.

19                 So it went from a suspension,

20   which he never knew about it because he never

21   came in, to a firing when with -- under the

22   context that he wasn't interacting with our

23   office as one of our employees, he then was

24   where he was not supposed to be because he was

25   supposed to be in Philadelphia.



Page 25

```
 1                    So if you're in a hotel, or a
 2   motel, somewhere near to Stroudsburg, when
 3   you're supposed to be at the office, having
 4   been summoned there, without telling us why you
 5   can't come, that was enough for me to say, I've
 6   had enough, and I discharged him.
 7   Q.               Was he summoned to the office at
 8   5:26 the day before?
 9   A.               I don't know.
10                    I was not directly participating
11   in the efforts to communicate with him.  Those
12   were, I assume, done by Chief County Detective
13   Kerchner.
14                    I remember him relaying these
15   concerns, he's not getting back to me, I think
16   once sent in an e-mail that was read but was
17   not responded to.
18                    At some point, he must have said
19   something because it was my impression from Mr.
20   Kerchner that he had either a veterinary
21   emergency or a medical emergency, and he was in
22   the city of Philadelphia.
23   Q.               But if I represented to you that
24   the e-mail to Mr. Kreischer was sent at
25   5:26 p.m. the day before, and told that he had
```



Page 50

```
 1    something as directed from simply having

 2    something?

 3    A.              No, I don't.

 4    Q.              Do you ever have

 5    any conversation -- strike that.

 6                    At some point, were the

 7    Pennsylvania State Police asked to get involved

 8    in an investigation of Mr. Kreischer?

 9    A.              I was aware of that, yes.

10                    I didn't make that call, but I

11    was aware that, as appropriate, there was an

12    investigation requested from an entity outside

13    our office to look into these matters.

14    Q.              I'm going to follow up with

15    that, but if we could stay on Orlando 3.

16                    If you could look at

17    Interrogatory No. 5.

18    A.              Okay.  Do you want me to read

19    it?

20    Q.              Yeah.  Read it to yourself.

21    A.              Okay.

22                    I've read it.

23    Q.              Okay.  It states that Detective

24    Serfass did obtain cell phone records from

25    Jessica Butts, correct?
```



Page 51

1    A.              Yes.

2    Q.              And then it states that they

3    were obtained in an effort to locate her and

4    create a timeline of her contact with Michael

5    Kreischer, correct?

6    A.              It says that, yes.

7    Q.              Why was Detective Serfass

8    interested in obtaining -- why was she

9    interested in locating Ms. Butts?

10   A.              I don't specifically recall

11   everything about that, but I know they were

12   looking into whether or not Mr. Kreischer was

13   involved in facilitating, among other things,

14   providing her with protection or access to

15   narcotics.

16                   I don't believe that's the only

17   thing.  I know they were also looking into

18   whether or not he was obtaining money from her

19   under circumstances which were not appropriate

20   and whether or not he facilitated retention of

21   her child by falsely representing himself as

22   the parent of the child to another law

23   enforcement agency.

24                   But the specifics of those

25   concerns, the timing of them, and the specific



Page 52

1   actions taken by the Pennsylvania State Police

2   with our cooperation to figure all those issues

3   out elude me due to the passage of time.

4   Q.              Okay.  I'll follow up on your

5   response, but for now, it says, these records

6   were obtained in an effort to locate her.

7                   Why was Monroe County interested

8   in locating Jessica Butts?

9   A.              I'm not -- I can't recall

10  specifically what the reason was other than the

11  obvious, to figure out whether she was involved

12  in an elicit drug-related relationship with Mr.

13  Kreischer.

14  Q.              The detention warrant for Ms.

15  Butts that was issued, was issued out of

16  Luzerne County, Correct?

17  A.              I know it was another county.  I

18  don't recall the county.  I don't believe it

19  was Monroe County.

20  Q.              Did Luzerne County ever contact

21  Monroe County and ask for assistance in

22  locating Ms. Butts?

23  A.              I can't recall one way or the

24  other.

25  Q.              In your experience, is that a



Page 53

```
 1    common occurrence for another county to
 2    assist -- ask one county to assist in locating
 3    someone who may have a warrant for them?
 4    A.              It has occurred, but I don't
 5    know if it occurs in all situations.  I don't
 6    have a specific recollection of how many.
 7    Q.              Now, if you continue reading on,
 8    Interrogatory No. 5.
 9                    So it says, the records were
10    obtained in an effort to locate her, create a
11    timeline of her contact with Mr. Kreischer, and
12    then at the end, and to verify that Michael
13    Kreischer had been truthful with Chief Kerchner
14    and ADA Michael Mancuso about his contact with
15    her for purposes of the suspension of his
16    employment.
17                    What is that referring to?
18    A.              I really can't tell you.  I'm
19    sure I knew at the time, but I can't recall
20    now.
21    Q.              Well, why would it matter
22    whether Mr. Kreischer was truthful with Chief
23    Kerschner and Michael Mancuso with respect to
24    his employment?
25    A.              I don't know whether that means
```



Page 54

```
 1    specifically just his employment or whether

 2    also in the context of his interactions with

 3    this Jessica individual.

 4    Q.              Well, again, it's drafted by a

 5    lawyer, and it says about his contacts with

 6    her, paren, for purposes of the suspension of

 7    his employment.

 8                    That's what it says, right?

 9    A.              Yes.

10    Q.              But you don't know what it's

11    referring to?

12    A.              No.

13    Q.              Before I asked you those last

14    three questions, you said that there was an

15    investigation performed by the Pennsylvania

16    State Police?

17    A.              Yes.

18    Q.              Was that requested by you?

19    A.              I didn't make the request.  I'm

20    sure I was aware of the request and in support

21    of the request, but I didn't call the

22    Pennsylvania State Police to actually initiate

23    it.

24                    But I felt it was appropriate.

25    I do recall that.
```



Page 55

1    Q.                Were you involved in the

2    investigation done by the Pennsylvania State

3    Police?

4    A.                No.

5    Q.                Not in any way?

6    A.                I remember one brief

7    conversation with Justin Leri, the

8    investigating trooper, after it was over, and

9    there may have been progress reports given to

10   me, not by him but by others.  But I don't

11   recall them.

12                     But I wasn't watching the

13   investigation or trying to carefully keep track

14   of what was going on while it was being

15   conducted by the Pennsylvania State Police.

16                     (Orlando Exhibit Number 2 was

17   Marked for Identification.)

18   BY MR. McCOMB:

19   Q.                If you could look at the

20   Pennsylvania State Police records, I think are

21   over there, in front of you.

22   A.                In this black binder?

23   Q.                Yeah.  It was previously marked

24   as -- I believe it was Orlando 2.

25                     And if you could look at page



Page 56

```
 1   274.
 2   A.              Page --
 3   Q.              274.  It's the second to last
 4   page at the end.
 5   A.              Okay.  I've got it.
 6   Q.              Okay.  And I'll represent for
 7   the record this is part of the Pennsylvania
 8   State Police general offense reports, and it
 9   looks as if it's a follow-up report dated
10   February 26, 2020.
11              And it looks as if it's in
12   reference -- I'll read, in February 2020, I met
13   with DA Christine at the Monroe County District
14   Attorney's Office.  DA Christine indicated that
15   he had reviewed the report and at this time is
16   not requesting any criminal charges.  DA
17   Christine stated that should any additional
18   information become available, he would like to
19   be informed.
20              Do you see that?
21   A.              Yes.
22   Q.              Do you recall the meeting with
23   this officer?
24   A.              I believe that was probably what
25   I was referring to when I said I remember
```



1    talking to Justin Leri about the investigation.

2                    This would have been when that

3    occurred.

4    Q.             It states that you had reviewed

5    the report.

6                    What report is being referred to

7    here?

8    A.             I assume whatever records were

9    developed in the course of the investigation.

10                    I don't recall reading the

11   report.  I'm sure I did.  I just don't have any

12   recollection of it, but I do recall the

13   conversation I had with Trooper Leri about his

14   investigation.

15   Q.             Are you aware that in discovery,

16   we served a document request for all

17   communications, e-mails, memoranda, all

18   investigative reports in the possession of any

19   of the Defendants relating to Mr. Kreischer?

20   A.             I'm not aware of that, but I

21   would assume that would be appropriate to have

22   done.

23   Q.             Did you personally make a search

24   for any documents that may have been responsive

25   for that request?



```
 1   have done that, not -- in my experience in the
 2   24 years I've been the DA.
 3   Q.            So if -- I want to make sure I'm
 4   following you.
 5               So no litigation hold request
 6   was issued by you or anybody under your
 7   direction?
 8   A.            Once again, you're using the
 9   word, litigation hold.
10               I did not prepare an e-mail
11   saying, I hereby initiate a litigation hold.
12   Everyone here, meaning everyone involved in
13   this investigation, would have known not to get
14   rid of documents and to hold them just as a
15   matter of course.  They don't need to be told
16   to do that because it's improper to dispose of
17   documents that might be relevant in pending
18   litigation.
19   Q.            Do you have any explanation then
20   for why it was that your counsel represented
21   that there are, no responsive documents?
22   A.            I don't know -- once again, I
23   don't know what that means in context of what
24   has been submitted to you.  I haven't looked,
25   at least recently, in what has been submitted
```



Page 74

```
 1   to you as discovery.  Just as I can't tell you
 2   what I think you mean by investigative file.
 3                   I know of no situation here
 4   where there are documents involving this case
 5   that you have not received.  No personal
 6   knowledge of that, if that helps you.
 7   Q.              One way or the other?
 8                   And again, the representation is
 9   this, Orlando 2, the Pennsylvania GO reports,
10   didn't come from your office.
11   A.              You've said that.
12   Q.              Right.
13   A.              Having not have been involved in
14   the investigation day-to-day, I can't tell you
15   where things came from, where they went, and
16   how they were stored.
17   Q.              Why was this matter referred to
18   the Pennsylvania State Police in the first
19   instance?
20   A.              To figure out whether he was up
21   to no good.
22   Q.              But why them?
23                   It looks as if your office is
24   conducting an investigation but sending stuff
25   to the Pennsylvania State Police.
```



Page 80

1   Q.              What she was doing in terms of

2   an investigation of Mr. Kreischer.

3   A.              You mean since the filing of the

4   complaint?

5   Q.              At any time prior to today.

6   A.              I'm sure I've had conversations

7   with her about this case, and I know I remember

8   asking the people that you -- in my office that

9   you previously deposed, like, what were you

10  interested in, but I have no recollection

11  beyond that.

12  Q.              You don't recall any specific

13  conversations with Detective Serfass about her

14  investigation post termination of Mr.

15  Kreischer?

16  A.              I don't recall one way or the

17  other.  It could have happened.  I have no

18  idea.

19  Q.              You testified earlier that --

20  and I think you used -- when I had asked what

21  you were looking at, something like, you know,

22  whether Kreischer was up to, no damn good, or

23  what he was --

24  A.              I didn't say -- up to no good, I

25  said.



Page 81

```
 1   Q.              Up to no good.
 2   A.              Which is sort of an inartful way
 3   of -- what I should have said in proper
 4   legalese is to determine whether or not his
 5   interaction with this woman -- I can't remember
 6   her name.
 7   Q.              Ms. Butts.
 8   A.              Yeah, Ms. Butts -- the
 9   circumstances of his financial interactions
10   with her, the allegation that he made a false
11   statement to law enforcement authorities post
12   termination about being the father of the child
13   in question and whether or not he was
14   facilitating her use of illegal narcotics or
15   protecting her in some way using his law
16   enforcement skills and experience to do so,
17   were all worthy -- in general, worthy things to
18   be investigating, which was what my
19   understanding was, generally, the State Police
20   investigation.  Although, as I said, I did not
21   follow day-to-day the course of their
22   investigation.
23   Q.              As we sit here today, you're not
24   aware of any facts that would tend to support
25   going forward with an investigation or not
```



Page 82

1   support going forward with the investigation?

2   A.          I recall from the exhibit you

3   showed you me, that Justin Leri and I agreed

4   that at the point in time we had that

5   conversation, there was no justification to

6   file criminal charges unless further

7   information was developed.

8   Q.          And that was in March of 2020?

9   A.          Right.

10  Q.          He was terminated in March 2019?

11  A.          Yes, correct.

12  Q.          And as we see, the activities of

13  your office followed from approximately

14  March 1st, 2019, up until your last -- that

15  last communication --

16  A.          I don't recall the specific

17  timing other than what may be revealed by these

18  papers.

19  Q.          Do you recall your office

20  submitting something to the Pennsylvania

21  Unemployment Compensation Board with respect to

22  Mr. Kreischer's request for unemployment

23  compensation?

24  A.          No, other than that's usually

25  handled by the human relations department of



# EXHIBIT "E"

# PENNSYLVANIA STATE POLICE

### General Offense Report



**GO# PA 2019-917616**   **Operational Status: CLOSED**

| Commonwealth of Pennsylvania | | APPLICATION FOR |
|---|---|---|
| COUNTY OF  MONROE | | **SEARCH WARRANT** |
| | | AND AUTHORIZATION |

| Docket Number (Issuing Authority): | Police Incident Number:  20190301M0122 | Warrant Control Number: |
|---|---|---|

| DETECTIVE WENDY SERFASS | DISTRICT ATTORNEY'S OFFICE | (570)517-3052 | 3/15/2019 |
|---|---|---|---|
| AFFIANT NAME | AGENCY | PHONE NUMBER | DATE OF APPLICATION |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible) :
All account records for PNC Bank card 4430 4600 2812 5696 including any
accounts accessed to fund transactions of this card to include signatory
documentation, account holders,  detail records of all account transactions
from February 1, 2019 to present.

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)
Social security numbers and financial information (e.g., PINs) should not be listed. If the identity of an account number must be established,
204 PA §§ 213.1 - 213.7.

*This is to certify this is a true and correct copy of the original record*
*Copied from the Record this 15 Day of*
*March A.D. 2019*

PNC Bank, 43 N 6th Street, Stroudsburg, Pennsylvania, Monroe

Court of Common Pleas of Monroe County
Forty Third Judicial Circuit Commonwealth of Pennsylvania
~~Georg J. Worten, Clerk of Courts & Clerk of Orphans' Court~~
By: *Jessica Kowell, Chief Deputy*
Jessica Kowell, Chief Deputy Clerk of Courts & Clerk of Orphans' Court

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES (If proper name is unknown, give alias and/or description):
Jessica Butts

| VIOLATION OF (Describe conduct or specify statute):  Flight to Avoid Apprehension | DATE(S) OF VIOLATION:  January 5, 2019 to present |
|---|---|

[X] Warrant Application Approved by District Attorney - DA File No. *77 Jammer* 3/15/19-1
(If DA approval required see Pa.R.Crim.P. 202(1) with standard Pa. per Pa.R.Crim.P. 507)

[ ] Additional Pages Attached (Other than Affidavit of Probable Cause)

[ ] Probable Cause Affidavit(s) MUST be attached (unless sealed below) Total number of pages:   **4**
TOTAL NUMBER OF PAGES IS SUM OF ALL APPLICATION, PROBABLE CAUSE AND CONTINUATION PAGES EVEN IF ANY OF THE PAGES ARE SEALED

The below named Affiant, being duly sworn (or affirmed) before the Issuing Authority according to law, deposes and says that there is probable
cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to
seizure, and is located at the particular premises or in the possession of the particular person as described above.

| *Wendy Serfass* | MONROE COUNTY DA OFFICE | 37672 |
|---|---|---|
| Signature of Affiant | Agency or Address if private Affiant | Badge Number |

Sworn to and subscribed before me this _____ day of _____ , _____. Mag. Dist. No.

_____   (SEAL)
Signature of Issuing Authority          Office Address

**SEARCH WARRANT**
TO LAW ENFORCEMENT
OFFICER:

WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from
which I have found probable cause, I do authorize you to search the premises or person described, and
seize, secure, inventory and make return according to the Pennsylvania Rules of Criminal Procedure.

[X] This Warrant shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM but in no event later than

[ ] This Warrant shall be served as soon as practicable and may be served any time during the day or night but in no event later than **
4:34 P M, o'clock *17 march* . *2019*

[ ] This Warrant shall be returned to judicial officer _____ .

* The issuing authority should specify a date no later than two (2) days after issuance.  Pa.R.Crim.P. 205(4).
** If the issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the
accompanying affidavit(s) and wishes to issue a nighttime warrant then this block shall be checked.  Pa.R.Crim.P. 206(7).

Issued under my hand this 15 day of *march* 2019 at 4:34 M, o'clock.

*43 J*                          *31 Dec 2019*  (SEAL)

| Signature of Issuing Authority | Mag. Dist. or Judicial Dist. No. | Date Commission Expires |
|---|---|---|

Title of Issuing Authority:   [ ] Magisterial District Judge   [X] Common Pleas Judge   [ ]

[X] For good cause stated in the affidavit(s) the Search Warrant Affidavit(s) are sealed for *90* days
by my certification and signature. (Pa.R.Crim.P. 211)

_____      *15 march 2019* (Date)
Signature of Issuing Authority      (Judge of the Court of Common Pleas or Appellate Court Justice or Judge)                (SEAL)

MDJS 410A

*K Clerk of Courts*
MAR 15 '19 PM 4:39



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2019-917616**     **Operational Status: CLOSED**

| Commonwealth of Pennsylvania |  | **AFFIDAVIT OF** |
|---|---|---|
| COUNTY OF   MONROE | | **PROBABLE CAUSE** |

| Docket Number (Issuing Authority): | Police Incident Number:   20190301M0122 | Warrant Control Number: |
|---|---|---|

**PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:**
Social security numbers and financial information (e.g. PINs) should not be listed.  If the identity of an account number must be established, use only the last 4 digits.
204 PA §§ 213.1 - 213.7.

Your Affiant is a sworn police officer since December, 2007 and has been employed as a Monroe County Detective since October, 2006.  Through the course of my employment I have investigated various criminal activity ranging from domestic violence to homicide.  In such, I have received training on and have prepared Affidavits of Probable Cause for various Court Orders and Search Warrants in furtherance of obtaining information such as bank records, cellular telephone records and other information that has been used as evidence in investigation and prosecution of criminal activity as defined in the Pennsylvania Rules of Criminal Procedure and Crimes Code.

On February 28, 2019 between the hours of 9:00 AM and 4:00 PM, Detectives from the District Attorney's Office, the Federal Bureau of Investigation and other agencies were conducting surveillance through the Safe Streets Program at the Howard Johnson hotel on Route 611, Bartonsville, Monroe County prior to effectuating a drug arrest and search warrant.  The location is known for human trafficking and narcotics distribution.  While at the hotel, Officer Shelley observed then Detective Michael Kreischer enter the hotel, then exit a short time later.  Kreischer had earlier informed Chief County Detective Kerchner that he would be out from work that day due to illness.

Kreischer was also observed by County Detective Marion Orlando.  Prior to leaving, Kreischer quickly greeted Orlando and left in a pickup truck.  Orlando observed that Kreischer appeared nervous.  A short time later, Kreischer contacted Detective Mario Orlando by telephone and indicated he was at the hotel to see 'Jess' known to Orlando as Jessica Butts the mother of his 'godchild', and "get a check for C███".  Kreischer further indicated that he was taking Jessica to a second treatment facility and that she had only been there for the weekend after having been discharged from a prior facility on Friday, February 22, 2019.  On Thursday, February 28, 2019, Detective Orlando went to room 149 of the Howard Johnson hotel and spoke to Jessica Butts in the doorway.  During the brief conversation, Butts appeared under the influence of a controlled substance.  Jessica acknowledged that Kreischer had stopped to see her earlier.

Jessica Butts is currently under supervision by the Luzerne County Probation Department for drug offenses.  On Friday, March 1, 2019, a Commit and Detain Warrant was issued by Luzerne County for Butts who failed to attend random drug screening appointments since January 5, 2019.  During the early morning hours of Friday, March 1, 2019, your Affiant and Probation Officers Dalton and Reese of the Monroe County Probation Department sought Jessica at the hotel.  Jessica was not located at the hotel and had left without checking out.  Her probation officer was not aware of Butts having been in any treatment facilities during the time she had failed to appear for her appointments.

(Continued)

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Affiant Signature            Date 3/15/2019    Issuing Authority Signature            Date  15 March 2019    (SEAL)

Page  2  of  4  Pages

MDJS 410B-10



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2019-917616**   **Operational Status: CLOSED**

| Commonwealth of Pennsylvania | | AFFIDAVIT OF |
|---|---|---|
| **COUNTY OF   MONROE** |  | **PROBABLE CAUSE** |

| Docket Number (Issuing Authority): | Police Incident Number:   20190301M0122 | Warrant Control Number: |
|---|---|---|

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:
Social security numbers and financial information (e.g., PINs) should not be listed.  If the identity of an account number must be established, use only the last 4 digits.
204 PA § 213.1 - 213.7.

Upon further investigation, it was learned that Butts had actually been staying at the hotel from February 9, 2019 through February 28, 2019.  The hotel room that Butts was staying in was fully paid for, however; it was left in a filthy state.  There was rotten food, garbage, vomit and other litter all about the floor and furniture, the bedding had not been laundered as Butts refused housekeeping services.  Drug paraphernalia and syringes were also found in the room indicating that Butts was using during the time she was staying there. Hotel staff members had observed Jessica on occasion and knew that she did not have a vehicle.  Kreischer was seen at the hotel coming or going from her room on at least one occasion.  Additionally, surveillance footage from the Hotel lobby depicts Kreischer approaching the front desk on February 28, 2019 and asking to extend Jessica's room for one additional night.

Kreischer has since been terminated from his employment with the District Attorney's Office.  Kreischer alleged he was taking Jessica to a treatment facility in the Lehigh Valley, but did not respond when informed of the warrant.  Kreischer has not cooperated in locating Jessica.  The last known activity of Jessica, leaving the Howard Johnson Hotel in Monroe County, is believed to have been accomplished with the aid of Kreischer.

Butts is known to use the telephone number 570-394-4900 and it is still an active account.  Kreischer has denied any knowledge of Butts' location and has as recently as March 3, 2019, told family members of Butts that he has not heard from her in 'weeks'.

The investigation has also revealed that Jessica Butts is beneficiary of her mother's estate and within the last several months received several hundred thousand dollars in inheritance.

In March, 2018, Jessica Butts was arrested by the Wilkes-Barre Township Police Department in Luzerne County for drug offenses and reckless endangerment.  At that time, both Kreischer and Jessica Butts identified Kreischer as the father of Cameron Butts, the minor child that was with Jessica at the time of her arrest.  Michael and his wife, Roseann Kreischer currently have custody of Cameron aka Cami since early March, 2018 based upon the representations to both law enforcement in Luzerne County and Luzerne County Children and Youth Services that Kreischer is C████ biological father.

During his employment with the Monroe County District Attorney's Office, Kreischer repeatedly denied being the father of Cami, but stated that he was the 'god father' because of his longtime friendship with Jessica that started when he was a Scranton police officer and she was a confidential informant for him.  After Jessica's arrest in March, 2018, Kreischer indicated to several co-workers that he was in the process of obtaining custody of Cami due to the continued drug abuse of Jessica.  A search of the Prothonotary's Office in both

(Continued)

THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE
TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_Affiant Signature_     Date 3/15/2019     _Issuing Authority Signature_     15 March 201 9     Date   (SEAL)

Page   3   of   4   Pages

MDJS 410B-10



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2019-917616**     **Operational Status: CLOSED**

| Commonwealth of Pennsylvania |  | AFFIDAVIT OF |
|---|---|---|
| **COUNTY OF   MONROE** | | **PROBABLE CAUSE** |

| Docket Number (Issuing Authority): | Police Incident Number: 20190301M0122 | Warrant Control Number: |
|---|---|---|

PROBABLE CAUSE BELIEF IS BASED UPON THE FOLLOWING FACTS AND CIRCUMSTANCES:
Social security numbers and financial information (e.g., PINs) should not be listed.  If the identity of an account number must be established, use only the last 4 digits.
204 PA §§ 213.1 - 213.7.

Monroe County and Luzerne County shows that no such custody action has ever been initiated for Cameron Butts and based on the conflicting information, it is questionable who the biological father of Cami is and what right to custody of the child is due Kreischer.

The whereabouts of Jessica are still unknown to investigators which would tend to suggest she has not been admitted to a rehabilitation facility.  The state of her hotel room upon check-out would suggest that she is abusing illegal drugs and there exists a real concern for her health and welfare.  The only person that may have information relating to her whereabouts is Kreischer who was informed of the warrant and admonished to turn her in to authorities on Friday, March 1, 2019.  To date, no information about her whereabouts has been provided to authorities, no contact has been made to her probation officer with regard to her being admitted to a rehabilitation program and Kreischer has claimed to her family that he has not been in contact with her 'for several weeks'.

The investigation has revealed that Kreischer has been providing false information related to the biological parentage of Cameron Butts, his relationship with her mother, Jessica Butts, as well as, other factors including his financial situation over the course of several months.  That information coupled with the fact that Kreischer was the last person to be in the company of Jessica Butts, the fact he has custodial control over her child, and she has access to large sums of money which can be used for the child's benefit cause grave concern for the child's welfare.

Based upon the above investigation, I, Detective Wendy Serfass of the Monroe County District Attorney's Office, submit that there is probable cause to believe that Butts is aware of her commit and detain warrant and is actively avoiding arrest.  It is also possible that she is being aided by Kreischer who has refused to provide any information on her location to authorities.

Based on that information, your Affiant requests the Court issue this Search Warrant for the financial records of Jessica Butts, specifically, PNC account with card bearing the number of 4430 4600 2812 5696, expiration 12/21.  The financial transactions may provide details of her whereabouts and allow investigators to interview her regarding the actions of Kreischer in assisting her since March 1, 2019, forward the investigation into potential interference with the custody of Cameron Butts and allow her to be brought forth to answer her probation violations pending before the Luzerne County authorities.
Additionally, your Affiant requests the Affidavit attached to this Search Warrant be sealed pursuant to Pa.R.Crim.P. 211 for a period of ninety (90) days to protect the integrity of the investigation.

I, THE AFFIANT, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_(SEAL)_

Affiant Signature     Date 3/15/2019     Issuing Authority Signature     Date

Page   4   of   4   Pages

MDJS 410B-10



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2019-917616**        **Operational Status: CLOSED**

## Related Report Image(s)

**Type:** Other

**Description:** MCDA EMAIL CORRESPONDENCE REQUESTING INVESTIGATION

---

Leri, Justin M

| | |
|---|---|
| **From:** | Bailey, Jonathan |
| **Sent:** | Friday, July 5, 2019 11:16 AM |
| **To:** | Leri, Justin M |
| **Subject:** | FW: Kreischer investigation/referral |
| **Attachments:** | toshiba@monroecountypa.gov_20190705_094253.pdf |

**Importance:** High

-----Original Message-----
From: Bentzoni, Wendy <WSBentzoni@monroecountypa.gov>
Sent: Friday, July 5, 2019 10:57 AM
To: Brutosky, Devon M <dbrutosky@pa.gov>
Cc: Bailey, Jonathan <jonbailey@pa.gov>; Kerchner, Eric <EKerchner@monroecountypa.gov>; Mancuso, Michael <MMancuso@monroecountypa.gov>
Subject: Kreischer investigation/referral
Importance: High

Lieutenant Brutosky,

Attached please find a report of the preliminary investigation that I completed with regard to Michael Kreischer.  My involvement in this was based on concerns that came out in the final days of Mr. Kreischer's employment with the Monroe County District Attorney's Office.  It is my belief that Mr. Kreischer has committed criminal acts in regard to Jessica Butts and ▮▮▮▮ B▮▮, specifically, false reports to Law Enforcement (he told the Wilkes-Barre Township Police Dept that ▮▮▮▮ was his child despite having denied that claim repeatedly) and Hindering Apprehension (as a LE Officer, he should have and likely was aware that Jessica would have had a warrant for her failure to complete and attend her sentence of Probation with Luzerne County).  Ms. Butts has recently been arrested on the outstanding warrant and is currently being housed in the Luzerne County Prison.  Her probation violation hearing is set for Tuesday, July 9, 2019.  Her arrest has prompted our office to request the Pennsylvania State Police to take jurisdiction over this investigation, however, I am quite familiar with various aspects of this situation and am happy to assist on her interview if you desire.

I have obtained cellular telephone records and banking records that may be of use to your investigators.  I have copies available should you decide to take over this investigation.  I have summarized the contents in my report which is attached to this email.

Please feel free to reach out if you need further clarification.

Regards,
Wendy


Wendy Bentzoni Serfass
Detective Sergeant
Monroe County District Attorney's Office
610 Monroe Street, Ste 126
Stroudsburg, Pennsylvania 18360

1

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF

PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

MICHAEL KREISCHER,  \*

    Plaintiff  \* Civil Action No.

    vs.  \*  21-cv-00221

E. DAVID CHRISTINE, JR.,

MICHAEL MANCUSO,  \*

WENDY B. SERFASS,  \*

MARIO ORLANDO and  \*

ERIC KERCHNER,  \*

    Defendant  \*

\*

\* \* \* \* \* \* \* \*

DEPOSITION OF

ERIC KERCHNER

November 22, 2022

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.



Page 9

1    A. Again, they were the write-ups, the

2    discussions I had with Mike that I documented

3    discussions with Michael Kreischer.

4    Q. Okay.

5  And what is your title, sir?

6    A. Chief County Detective.

7    Q. And, I asked Detective Orlando this, do you

8    have familiarity with the process in your office

9    for issuing a litigation hold?

10    A. Other than if a request is made, we would

11    hold it, other than that, no.

12    Q. Who would make the request for litigation

13    hold?

14    A. I guess the people who are suing us.

15    Q. So, if your office is aware of possible

16    litigation and there's no specific request, you

17    don't do a litigation hold?

18    A. Correct.

19    Q. Now in this case, were you aware that Mr.

20    Kreischer had counsel?

21    A. When?

22    Q. The day he was terminated.

23    A. No, I'm not aware.

24    Q. Okay, if you could turn to I think it's

25    Orlando-1 should be in front of you with a



1    Q. How about if there wasn't a warrant out for

2    that person?

3    A. Well, that would also make a difference.

4    Q. So, it is significant as to when the warrant

5    was issued?

6    A. Look right here is exactly what I said in

7    writing on the dates that I said it.

8    Q. And the next sentence says, upon that

9    discovery of the fact that the Mr. Kreischer lied

10   to both First District Attorney, Michael Mancuso

11   and I about matters of material importance.  What

12   did he lie about?

13   A. About what he was doing.  About his job with

14   LOFT.  He lied about his job with LOFT.  He

15   wasn't telling us the truth.  He told us that he

16   was leaving to go full-time with them, which was

17   not true.  He told us he was working when it was

18   not true.  And he would not support anything with

19   written documentation.

20   Q. So, the lying was about his possible job with

21   the Attorney General's Office?

22   A. Yes, that was very important, yes.

23   Q. And so because he didn't tell you the truth

24   in your mind about what his future job was going

25   to be, you regarded him as someone who could no



Page 51

1    longer be trusted to testify truthfully under

2    oath as a Commonwealth witness?

3    A. Yes, that's part of the reason.  The other

4    part of the reason was because he wasn't

5    submitting reports, he wasn't backing up his

6    verbal reports about what he was doing.

7    Q. In your mind, is there a difference between

8    someone not volunteering whether they're leaving

9    a job and someone committing perjury?

10   A. Yes, yes.  We couldn't trust him.  We could

11   not trust him.  That's the reason he was term ---

12   well, actually the reason he was terminated is

13   because he wouldn't even come in to talk to us.

14   He was given several opportunities to come in and

15   talk to us and he refused to do that.  So, I had

16   no other choice but to terminate his employment.

17   Q. You sent the text on the 28th at 5:58 to come

18   in and talk to me and then he didn't come in and

19   then you terminated him on the next day at 11?

20   A. Correct.

21   Q. That was the terminable offense?

22   A. Yes it was.  He was written up three other

23   times and warned a fourth time about his failure

24   to communicate with us and it just did no good.

25   Q. As you sit here today, are there any other



# EXHIBIT "G"

**mhk@ptd.net**

| | |
|---|---|
| **From:** | Kreischer, Michael <mkreischer@monroecountypa.gov> |
| **Sent:** | Thursday, February 28, 2019 5:16 PM |
| **To:** | mhk@ptd.net |
| **Subject:** | Fwd: Hound update confidential |

Sent from my iPhone

Begin forwarded message:

> **From:** "Kreischer, Michael" <mkreischer@monroecountypa.gov>
> **Date:** February 25, 2019 at 6:49:22 AM EST
> **To:** "Mancuso, Michael" <mmancuso@monroecountypa.gov>
> **Subject: Hound update confidential**
>
> Michael,
>
> I wanted to give you an update and some personal and confidential information. I did have a productive discussion with Eric on Friday and I thank you for that.
>
> Friday my team with the PA OAG was successful in making a purchase from Moolah, last name Finikin. He is Blood Hound Brim, FINALLY!! As you know I have been working months trying to get into this group. I have enough with this buy and background information to include jail calls to obtain a pen register, which I am working on the affidavit this week. He actually said to the informant if you want to buy dope buy dope, do not bother me with bricks. Moolah stated in the past they used to purchase heroin in brick form and cut and package at the home of Bang's (Koroma) girlfriend in APCP. They now purchase and do so at his residence which is in marshalls creek which we have not located yet. The car he was in with his girlfriend is registered to her in long pond. Since Bang is now incarcerated the street supervisor is VI, VI is in Wilkes Barre and his name is Vince Brown. I have him identified by jail calls and through Nubbs who has had calls with him. I am working on a search warrant for facebook and instagram records. Nubbs is doing what he can to assist.
>
> As we have discussed in the past issues that have occurred in office are ludicrous and childish. When I explained to Eric how I was working these cases and I am the Affiant, well there are 2 and 3 on these larger cases he really didn't understand. I believe he may have a little more insight and was shocked when I told him that the last wire I did the affidavit was an excess of 800 pages. He does not understand the amount of time and leg work, surveillance, interviews both ci and jailhouse that I put into these cases and Eric is one that wants to see detectives sitting behind desks. I was hired to look at the gang issue, we've discussed that assessment and how I have been attacking the issue. I cannot do that sitting behind a desk. Truly part of my issue and discussion with Eric was with Kim's jealously and her influence on Eric.
>
> I do not like gossip and have stood up against those issues, which has been quite unpopular. Eric really didn't like the turn of gossip about the cigarettes from evidence room and use of funds to purchase them. Understand as I told him I would never hurt you or David or the reputation of this office, as you had seen in how I have handled things in the past. That gossip was started as a test to one person. Honestly in this office there have only been 3 people I have discussed things with that have not gone anywhere. You, Wendy and Mario, sans David of course and Tom is just to new.

1

Addiction has touched my life in many ways.  I am motivated at what I do for a reason.  While you know the backstory of Cami's mother Jess, addiction through friends and family has touched me as early as my grade school days.  When I was in college I was a police officer.  I had left Berwick and was working part time in Courtdale before going to Scranton.  I was working parttime to keep my mopetc numbers and A cert current.  While working there, some of the guys found out who I was and my background in working as an undercover and wanted to get involved with the Luzerne County Drug Taskforce.  So I contacted my friends at the AG office and got them involved.  Of course part of that was me working cases with them as an undercover.  I worked a few and continued on with college and eventually getting hired in Scranton.  The chief in Courtdale was a guy by the name of Michael Bickauskas.  Michael had been part of my support team that ensured my safety when doing undercover buys.  A few years after I moved on to Scranton Michael had gotten injured on duty.  Well, he turned to street drugs, heroin.  Eventually he gets arrested, actually by someone I am close to at the AG's Office today.  Michael was crucified on tv by Peter Paul Olshefski the DA at the time.  So, of course what does a disgraced police officer out on bail do?  Yes, Michael committed suicide.

This is an example of how 2 other police officers have touched my life with addiction.  I look at addiction as a weakness and these gang members prey upon them.  As a police officer it is my duty to protect the weak and put these predators behind bars.  I cannot do that as an assistant to anyone.  I need to be in the field at the forefront and as an affiant investigator.

Eric is really hung up on when I am leaving.  I have been honest and upfront.  As soon as rumors began circulating I approached both you and Eric and advised I am moving on.  I advised Eric, these guys in AG office cannot discuss that.  I further advised Eric the process I am going through as the position I will fill is one of a current employee who has been reassigned for some issues and he has been fighting through the union process which seems to have finally come to a conclusion.  I do not have a date, but did advise I would provide as much notice as possible.

I know there are individuals pushing because they want their allies appointed to my positon when I vacate.  It honestly gets tiring having to be the one to take the high road while others can continue to poke the bear and do as they please.

My time here with Monroe I have gathered a lot of gang knowledge and I do look forward to continuing our relationship and putting these guys where they belong.  This is where I reside and am raising a young child.  I want a safe environment for her, not to mention my previous stated motivation.  So, even after I paid by a different agency I will still be here in the area working with you and the office.  I have brought resources to this office and will continue to do so.

Thanks for listening.  If you want to discuss anything, please reach out.

Mike


I forgot update on Geltz, he has been working in Philadelphia.  I will meet with Ryan and work out when we can get him here.  Since he already been before you we may need to consensualize on phone, but will discuss with you.

Detective Michael H. Kreischer                    Task Force Officer
Monroe County Office of the District Attorney       Pennsylvania Office Of Attorney General
Detective Division                                Bureau Narcotic Investigation, Region I Allenton
610 Monroe Street, Suite 126                      2305 28Th Street S.W.
Stroudsburg, PA  18360                            Allentown, PA  18103

2

P043

(570) 517-3152 Office | (570) 517-3825 Fax
Email: mkreischer@monroecountypa.gov          c-mkreischer@attorneygeneral.gov

Website: http://monroecountyda.com          www.attorneygeneral.gov

3

P044

# EXHIBIT "H"



## NOTICE OF DETERMINATION

**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
OFFICE OF UNEMPLOYMENT COMPENSATION BENEFITS

The final day to file a timely appeal to this determination is April 17, 2019.

SSN:            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
Type Claim:     US
AB Date:        March 10, 2019
Mailed On:      April 02, 2019
Page:           1 of 9

**EMPLOYER:**

MONROE COUNTY COMMISSIONERS
PO BOX 1180 CORPORATE COST CO
LONDONDERRY NH 03053

**CLAIMANT:**

MICHAEL H. KREISCHER
258 SCHOOLHOUSE ROAD
EAST STROUDSBURG PA 18302-

### FINDINGS OF FACT

1. The Claimant last worked on 2/27/2019.
2. The Claimant was discharged for aiding and abetting a fugitive from justice.
3. The Claimant denied being involved in the incident that caused the separation.
4. The Employer did not provide information to show that the Claimant was involved in the incident that caused the separation.

### DISCUSSION

In situations where a Claimant is discharged, the burden of proof is on the Employer to show the Claimant's actions that caused the separation constitute willful misconduct. Willful misconduct is defined as a willful disregard of the Employer's interests, a deliberate violation of the Employer's rules, a disregard for the standards of behavior which the Employer has the right to expect, or negligence which demonstrates wrongful intent or intentional and substantial disregard of the Employer's interests or the employee's duties and obligations. In this case, the Claimant did not admit to the incident which caused the separation and the Employer did not provide information to show the Claimant was involved in the incident that caused the separation. As such, the Employer has not sustained its burden of proof and benefits must be allowed under Section 402(e).

### DETERMINATION

The Claimant is eligible for benefits under Section 402(e) of the Pennsylvania Unemployment Compensation Law beginning with waiting week ending 3/16/2019.

**UC Representative:   MBU**

### APPEAL INSTRUCTIONS

The last day to appeal this determination is: **April 17, 2019.**

Under Section 501(e) of the Pennsylvania Unemployment Compensation Law, this determination becomes final unless an appeal is timely filed. If you disagree with this determination and wish to file an appeal, your appeal must be filed on or before the last day to appeal shown on this determination.

You may file your appeal online, or send a Petition for Appeal form or letter to the department by mail or fax. Regardless of the format you choose, your appeal must include the name and address of the claimant, the social security number of the claimant; if known, the date of the determination being appealed, the reason for the appeal and the name and address of the individual filing the appeal. If you use a Petition for Appeal form or a letter to appeal, you may file your appeal by mail, common carrier or fax, or by personal delivery to any CareerLink office. Please follow these appeal instructions carefully.

The last day to appeal this determination is: April 17, 2019
If you disagree with this determination, you may appeal. If you want to file an appeal, you must do so on or before the date shown above. Information for filing an appeal is included in this determination.



EXHIBIT
Kerchner
1
Jm   3/17/23

CLAIMANT:   MICHAEL H. KREISCHER.                                    SSN:   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
EMPLOYER:   MONROE COUNTY COMMISSIONERS                              Page:   2 of 3

If you file your appeal by mail, the appeal is filed on the date of the U.S. Postal Service postmark, certificate of mailing, or certified mail receipt. If there is no postmark, certificate of mailing or certified mail receipt, but the appeal contains a postage meter mark, the appeal is filed on the date of the postage meter mark. If there is no Postal Service information or postage meter mark, the appeal is filed on the date recorded by the Department when the appeal is received. If you file your appeal by common carrier, the appeal is filed on the date it is delivered to the common carrier as established by the records of the common carrier. If the date of the delivery to the common carrier cannot be determined by documents in the record, the appeal is filed on the date it is received by the Department. Please complete Section 1 of the enclosed Petition for Appeal form and return the form to the following address, or send a letter of appeal to:

Scranton UCSC
30 Stauffer Industrial Park
Taylor, PA 18517-9601

If you file your appeal by fax, the appeal is filed on the date of receipt imprinted by the receiving fax machine. If the receiving fax machine does not imprint a legible date, the appeal is filed on the date of transmission imprinted by the sending fax machine. If the faxed appeal does not contain a legible date of transmission, it is filed on the date recorded by the Department when it receives the appeal. If you appeal by fax, you are responsible for any delay, disruption, or interruption of electronic signals and the readability of the appeal, and you accept the risk that the appeal may not be properly or timely filed. Please complete Section 1 of the enclosed Petition for Appeal or FAX a letter of appeal to: 570-562-4385.

If you appeal online, the filing date is the date recorded by the department's electronic transmission system. You accept risk of delay, disruption, or interruption of electronic signals, which may affect the timeliness of the appeal. Complete your appeal online at www.uc.pa.gov/appeals.

If you file your appeal by personal delivery to a CareerLink, your appeal is filed on the date it is delivered to the CareerLink, during normal business hours. If you wish to appeal by personal delivery, take the completed appeal form (UC-46B) or letter to the nearest Pennsylvania CareerLink. The CareerLink representative will forward your appeal or letter of appeal to the UC Service Center. NOTE: Appeals can not be filed in-person at UC Service Centers.

IMPORTANT: If you remain partially or fully unemployed while an appeal concerning your eligibility is pending, continue to file your bi-weekly claims for benefits. If the appeal is decided in your favor, only benefits for the weeks you claimed will be released for payment. Your employer has the same rights of appeal as you do.

PROVISIONS OF THE PENNSYLVANIA UNEMPLOYMENT COMPENSATION LAW

Section 402(e) of the Law provides, in part, that a Claimant shall be ineligible to receive benefits for any week in which his unemployment is due to suspension or discharge for willful misconduct connected with the work.

THE EXPLANATION OF THE PENNSYLVANIA UNEMPLOYMENT COMPENSATION LAW PROVISIONS IS PROVIDED FOR INFORMATION ONLY. FOR FURTHER EXPLANATION OF THIS DETERMINATION, CONTACT THE PENNSYLVANIA UC SERVICE CENTER INDICATED IN THE APPEAL INSTRUCTIONS.

The last day to appeal this determination is: April 17, 2019
If you disagree with this determination, you may appeal. If you want to file an appeal, you must do so on or before the date shown above. Information for filing an appeal is included in this determination.

CLAIMANT:   MICHAEL H. KREISCHER                                    SSN:   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
EMPLOYER:   MONROE COUNTY COMMISSIONERS                             Page:   3 of 3

**CONTRIBUTING BASE YEAR EMPLOYER:** This is not a determination on relief from charges.  However, this determination may affect a request for relief from charges.

• An appeal to a Claimant's eligibility and a request for relief from charges MUST BE FILED SEPARATELY.

• For procedures and time limits for requesting relief from charges, see Form UC-44FR previously sent to you with the Claimant's Notice of Financial Determination, or contact the Employers' Charge Section, 7th Floor, Labor & Industry Building, 7th & Forster Streets, Harrisburg, PA 17121.

A REQUEST FOR RELIEF FROM CHARGES, WHETHER GRANTED OR NOT, WILL HAVE NO EFFECT ON THIS DETERMINATION.

# EXHIBIT "I"

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF
                    PENNSYLVANIA
              *  *  *  *  *  *  *  *  *
                          *
MICHAEL KREISCHER,        *
      Plaintiff           *  Civil Action No.
      vs.                 *  21-cv-00221
E. DAVID CHRISTINE, JR.,
MICHAEL MANCUSO,          *
WENDY B. SERFASS,         *
MARIO ORLANDO and         *
ERIC KERCHNER,,           *
      Defendant           *
                          *
              *  *  *  *  *  *  *  *
```

```
              DEPOSITION OF
            WENDY B. SERFASS
           November 22, 2022
```

```
Any reproduction of this transcript
is prohibited without authorization
       by the certifying agency.
```



Page 41

1 to be retained, I have to archive it.  I don't

2 know specifically if there's a protocol within

3 the county for changing that retention with

4 specific parameters.  I'm not aware of that, if

5 it's done.  I know, in this case, when this first

6 came, I sent an email to everyone in the office

7 and asked them to send me any communications they

8 had, and then I retained those.  And then,

9 anything I had would have been provided in

10 discovery.

11 Q. Okay, if you could turn to Orlando 3, it

12 should be in front of you.  And it's the response

13 to interrogatories.

14 A. Okay.

15 Q. If you would look at the response to

16 interrogatory No. 5.

17 A. Mm-hmm.

18 Q. And I'll just read it in the record,

19 ?Defendant Wendy B. Serfass did obtain cell phone

20 records for Jessica Butts.  Those records were

21 obtained in an effort to locate her and create a

22 timeline of her contact with Michael Kreischer,

23 during the timespan she was staying at the Best

24 Western, other communitcation with her parole

25 agent, and to verify that Michael Kreischer had



Page 42

1    been truthful with Chief Kerchner and ADA Michael

2    Mancuso about his contacts with her, paren, 'for

3    purposes of his suspension from his employment.'

4    Closed paren.  Discovery is ongoing, additional

5    information will be provided when it becomes

6    available.

7    So, what were you trying to find out, with

8    respect to whether Mr. Kreischer had been

9    truthful with Chief Kerchner, for purposes of the

10   suspension of his employment?

11   A. Prior to him being suspended, there was

12   information provided about him needing days off,

13   or being out of the office, or being unavailable,

14   for purposes of filing for custody, filing for

15   guardianship, things along that line.  I don't

16   remember specifically, and I don't know because

17   it was told to me after the fact.  That he had

18   said, ?I can't be in today,? or ?I can't do this

19   today because I have to take care of this for

20   Cameron.?  So, we were following up on some of

21   the prior information that had been provided.

22   Q. And why would that be a proper basis for

23   obtaining cell phone records?

24   A. The cell phone records were being used to see

25   what communication there was between the two of



Page 43

1    them, if he was telling her things, if he was

2    actually trying to get custody of Cameron.  I was

3    trying to create a timeline and see where she

4    was, what was going on, and put everything

5    together.  But working backwards.

6    Q. Why would it be relevant whether Mr.

7    Kreischer was being truthful with Chief Kerchner,

8    with respect to his employment situation?

9    A. At that point in time, when I first started

10   this investigation, he wasn't fired.  It happened

11   in a 24-hour period.  But I started working on

12   this case prior to him actually being terminated.

13   Q. Okay.  Ma'am, my question has to do with your

14   application to cell phone use.

15   A. Okay.  I don't understand your question then,

16   sorry.

17   Q. I don't understand your answer.  The cell

18   phone records were sought after he had been

19   terminated.

20   A. Right.

21   Q. What is the relevance as to whether or not

22   Mr. Kreischer was truthful to Chief Kerchner

23   about his contacts for purposes of the suspension

24   of his employment?  Are you trying to justify the

25   suspension and termination, and find stuff that



Page 44

```
 1    he did?  Was that the reason ---
 2    A. No, I wasn't trying to justify it, no.  I was
 3    simply doing an internal investigation.  And
 4    also, we had concerns about where the child was
 5    at that point in time, early on.  And concerns
 6    about where Ms. Butts was.  Once those things
 7    were determined, this case was sent to the
 8    Pennsylvania State Police.
 9    Q. At some point, were your concerns about the
10    wellbeing of the child, did they go away?
11    A. Yes.
12    Q. When was that?
13    A. Yes, they did.  Once I spoke to the
14    grandmother and was told by her that she knew
15    that Cameron was with the Kreischers, and that
16    she had seen Cameron, then I didn't have the same
17    concerns.  I had already done a Childline
18    referral and had not gotten any information back
19    from Children & Youth, to tell me one way or
20    another --- that there was anything to be
21    concerned about.  So, I wasn't as concerned at
22    that point.  I still had some concerns about the
23    whole situation, just as a person, but ---
24    Q. Well, if you turn to page 83 to Pennsylvania
25    State Police report, the affidavit of probable
```



# EXHIBIT "J"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF

PENNSYLVANIA

* * * * * * * * *

*

MICHAEL KREISCHER, *

    Plaintiff    * Civil Action No.

    vs.          * 21-cv-00221

E. DAVID CHRISTINE, JR.,

MICHAEL MANCUSO, :

WENDY B. SERFASS, :

MARIO ORLANDO and :

ERIC KERCHNER,    *

    Defendant    *

*

* * * * * * * *

DEPOSITION OF

MARIO ORLANDO

November 22, 2022

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.



1    Gieger, did you discuss discovery responses with

2    anyone?

3    A. No.

4    Q. Did anyone ask you to look for documents?

5    ATTORNEY GEIGER:

6    Apart from me.

7    THE WITNESS:

8    No.

9    BY ATTORNEY MCCOMB:

10   Q. Did anyone ask you for information to help

11   respond to these interrogatories?

12   A. No.

13   Q. Did anyone ask you to check your emails?

14   A. No.

15   Q. Are you familiar with the process in the

16   office for preservation of emails?

17   A. I believe they are erased after three months

18   unless you archive them.

19   Q. Is there a process to issue a litigation hold

20   in the office so that the emails aren't

21   automatically overwritten after ninety days?

22   A. I don't know that.

23   Q. Who would know that?

24   A. The people at IT, maybe Eric and maybe Wendy.

25   Q. Okay.



MAGNA
LEGAL SERVICES